## PILLINGER v. BEATY et al.

(Circuit Court of Appeals, Fourth Circuit. January 12, 1920.)

No. 1739.

1. **Receivers ☞56—Intervener without right to challenge jurisdiction.**

Where a receiver was appointed for a railroad company on a bill alleging its inability to meet its obligations, which was admitted by the answer, an intervener, who came in four years afterward, *held* to have no standing to challenge the jurisdiction of the court to appoint the receiver or to authorize him to issue certificates of indebtedness.

2. **Receivers ☞120—Bondholders estopped by acquiescence of mortgage trustee to deny validity of receiver's certificates.**

Where a lumber company, which held notes of an affiliated railroad company secured by trust deed, pledged such notes with a trustee to secure an issue of its own notes, and at the request of such trustee the mortgage trustee intervened in a receiver's suit against the railroad company and foreclosed its trust deed, such mortgage trustee *held* to represent the note holders of the lumber company, who were bound by its knowledge and acquiescence in the issuance of receiver's certificates in the suit, and not entitled to subsequently intervene and attack the validity of such certificates.

3. **Receivers ☞120—Transferee of bonds estopped to question validity of receiver's certificates.**

Where holders of notes secured by trust deed on the property of a railroad company, which was in process of foreclosure by intervention in a creditors' suit, had knowledge of, and in some cases expressly assented to, the issuance of receiver's certificates in the suit, believed to be for their own benefit, a subsequent nominal transferee of the notes *held* estopped to question the validity of the certificates.

Appeal from the District Court of the United States for the Western District of North Carolina, at Greensboro; James E. Boyd, Judge.

Henry Pillinger appeals from an order dismissing his petition of intervention in suit by W. W. Beaty and others against the Watauga & Yadkin River Railroad Company. Affirmed.

George W. Swain, of Chicago, Ill. (John E. MacLeish, of Chicago, Ill., and Aubrey L. Brooks and Oscar L. Sapp, both of Greensboro, N. C., on the brief), for appellant.

W. B. Councill, of Hickory, N. C., and Hiram R. Wood, of Rochester, N. Y. (Wm. P. Bynum, of Greensboro, N. C., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

KNAPP, Circuit Judge. The case in outline is this: Prior to 1914 the Grandin Lumber Company, a North Carolina corporation, had acquired a very large acreage of timber lands in the western part of that state. These lands had been surveyed, and a mill town, called Grandin, located at a point some 20 miles west of North Wilkesboro, which is on the Southern Railway. To carry on the operations of the lumber company it became necessary to build a railroad from North Wilkesboro to Grandin, and beyond the latter town into the

timber tract, in order to transport logs to the mill and the products of the mill to available markets. The lumber company obtained the charter of the Watauga & Yadkin River Railroad Company, which had theretofore been granted by the state of North Carolina, and loaned to it some $600,000 for the construction of a railroad between the points named. The further sum of $75,000 was loaned personally by W. J. Grandin, who was the president and apparently the principal stockholder of both the lumber company and the railroad company. These loans were represented by notes executed to the lumber company and Grandin, respectively. The lumber company had previously issued its bonds in the sum of $1,600,000, secured by deed of trust upon all its property, and the $600,000 loaned the railroad company was part of the proceeds of this bond issue. The construction of the railroad and mill plant was well advanced in the spring of 1914, when the business and financial depression existing at that time made it impossible for the railroad company to float a bond issue for the purpose of repaying the loans just mentioned. In short, an enterprise of magnitude was arrested before producing activities could be begun by inability to procure the additional money needed to complete the equipment.

In the effort to meet this situation, the railroad company made a deed of trust, dated March 10, 1914, covering all its property, to Kenneth D. Steere, of Chicago, as trustee, to secure the notes it had given in the aggregate sum of $675,000, as above stated. This deed of trust contained the usual provisions found in such instruments, including power of sale by the trustee, in case of default, and other remedies. At about the same time the lumber company issued to Clark L. Poole & Co., of Chicago, 35 so-called collateral trust gold notes for $5,000 each, secured by the pledge as collateral of the notes of the railroad company, which were secured by the deed of trust to Steere, together with other collateral, and this pledge was to the First Trust & Savings Bank of Chicago as trustee. Although the deposit agreement did not in terms assign the deed of trust made by the railroad company, but only the obligations secured thereby, the collateral followed the transfer, and undoubtedly gave the First Trust & Savings Bank the same interest in the deed of trust as the lumber company itself had, which interest was, of course, enforceable through the trustee named.

These collateral trust gold notes became due November 25, 1914, and the interest on the $1,600,000 of lumber company bonds and an installment of the principal became due on December 1, 1914. When these maturities were approaching, the mill and railroad were yet incomplete, and neither company was able to meet its obligations. To conserve their assets, and in the belief that the value of the properties was much in excess of all claims of creditors, both secured and unsecured, resort was had to the familiar action in equity for the appointment of a receiver. The bill filed for that purpose named both companies as defendants, their answer admitted the allegations and joined in the prayer of the bill, and accordingly on November 12, 1914, W. J. Grandin was appointed receiver of both companies.

From time to time receiver's certificates were authorized and sold as follows: June 28, 1915, $15,000; April 29, 1916, $12,000; August 10, 1916, $49,000; February 21, 1918, $46,000; or a total of $122,000. These certificates were given priority over the deed of trust of the railroad company. It seems that in April, 1915, there was an application by the receiver for authority to issue certificates, but this was opposed by one Alice Lincoln Barker, who was permitted to intervene in the suit, and who alleged that she was the owner of one of the $5,000 collateral gold trust notes of the lumber company. This application was denied, though whether because of this creditor's objection does not appear.

In May, 1915, before any certificates were issued, Kenneth D. Steere, trustee under the railroad's deed of trust, filed his petition for leave to foreclose the same, and to sue the railroad company and its receiver, alleging that he had been requested to do so by the First Trust & Savings Bank of Chicago as the holder of all the notes secured by the deed of trust. The petition was granted and the foreclosure suit begun accordingly. The answer of the defendants admitted the default, and consequent right to foreclose, but set up that it was an inopportune time to sell the property, and in effect asked that a sale be deferred. The decree of foreclosure was in fact filed on September 30, 1918, and there was a supplemental decree on the 26th of the following month. The sale took place on December 17, 1918, and the highest bid received was $160,000. In January, 1919, and just before the report of the sale was to be presented for confirmation, Henry Pillinger, appellant here, came in with a motion for leave to file an intervening petition and objections to the confirmation of the sale, and such leave was granted. He alleges in the petition thereupon filed that he is the holder and owner "by delivery thereof to him" of $165,000 of the collateral trust gold notes in question. The petition is a lengthy document, which recites in detail the facts above summarized and seeks, not only to prevent the confirmation of the sale of the railroad property, but to have the receivership and all proceedings thereunder declared void, on the ground that the court below never acquired jurisdiction of the railroad company, because the original bill of complaint, on which the receiver was appointed, set up no cause of action against that company. In a word, the appellant now attempts to sweep away all that has been done in this matter, in so far as the railroad company is affected, and especially to have the entire issue of receiver's certificates declared subordinate and not superior to the lien of the notes and trust deed pledged as security for the $175,000 of collateral gold trust notes. On motion, the court below dismissed the petition, on grounds recited in a series of findings incorporated in the order. The court did, however, continue for ten days the motion to confirm the sale, "in order to give an opportunity for an advanced bid." No higher bid having been made during the time allowed, the sale was confirmed on the 6th of February, 1919, when the purchase price was paid and the money distributed in accordance with the terms of the order of confirmation. Some three months later Pillinger brought this appeal from the order dismissing his petition.

[1] Without passing upon questions which do not go to the merits of the controversy, and conceding for argument's sake that the order is appealable, we will briefly state our reasons for concluding that the petition was properly dismissed. In the first place, we are of opinion that Pillinger, an eleventh-hour intervener, has no standing to question the jurisdiction of the court over the railroad company in the original suit, which resulted in the appointment of a receiver of that company. The applicable rule of law in such case seems to be well settled. In Mellen v. Moline Iron Works, 131 U. S. 352, 367, 9 Sup. Ct. 781, 786 (33 L. Ed. 178), the Supreme Court says:

"An adjudication that a particular case is of equitable cognizance cannot be disturbed in an original suit. Such adjudication is not void, even if erroneous."

In Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 380, 14 Sup. Ct. 127, 128 (37 L. Ed. 1113), the following is said:

"Defenses existing in equity suits may be waived, just as they may in law actions, and, when waived, the cases stand as though the objection never existed. Given a suit in which there is jurisdiction of the parties, in a matter within the general scope of the jurisdiction of courts of equity, and a decree rendered will be binding, although it may be apparent that defenses existed which, if presented, would have resulted in a decree of dismissal."

Again in Central Trust Co. v. McGeorge, 151 U. S. 129, 135, 14 Sup. Ct. 286, 288 (38 L. Ed. 98), the court says:

"It is scarcely necessary to say that, as the defendant company had submitted itself to the jurisdiction of the court, such voluntary action could not be overruled at the instance of stockholders and creditors, not parties to the suit as brought, but who were permitted to become such by an intervening petition."

In Cincinnati Equipment Co. v. Degnan, 184 Fed. 834, 107 C. C. A. 158, a case very much in point, it is said:

"It is to be remembered, however, that the defendant in the original suit admitted the averments of the bill and consented to the appointment of the receiver. Since the intervener has failed to aver or to prove collusion between the parties to the original suit, or anything tending to show a design to impose upon the court we must conclude that the act of the defendant in the original suit was a rightful submission to the jurisdiction of the court. The intervener therefore cannot be heard to reopen the case on any such ground. The principle to which allusion is made is a general one, and was sustained * * * by the present Mr. Justice Lurton in Horn v. Pere Marquette R. Co., 151 Fed. 626, 634."

In the light of these authorities, and others of similar import, it seems clear that Pillinger is in no position at this late day to assail the jurisdiction of the court, or to dispute the validity and priority of the receiver's certificates which the court authorized, on the ground that the appointment of the receiver was void for want of jurisdiction over the railroad company.

[2] In the second place we are of opinion that the holders of the collateral trust gold notes were represented by Steere, the trustee of the railroad's deed of trust which was pledged to secure those notes, and that they are bound by his knowledge of and consent to the issuing of the receiver's certificates. He applied for leave to foreclose at

the request of the First Trust & Savings Bank of Chicago, as his petition alleges, and the answer to his foreclosure suit disclosed to him in detail the circumstances under which and the purposes for which a receiver of the railroad company had been appointed in the action in which he intervened. It is beyond doubt, as the court below finds, that he was perfectly aware of the several applications for the issuance of receiver's certificates and of the several orders by which those certificates were authorized. If he did not formally consent in each instance, it is quite certain that he did not object or take any steps to prevent the creation of a lien on the railroad property superior to the lien of the deed of trust. Moreover, the petition of appellant does not allege that Steere did not know of these applications and orders, but merely that he had no authority to give consent, tacit or otherwise; nor does it allege that Steere failed in any respect to perform his duty as trustee of the pledged security, or to take such action as he deemed most beneficial to the holders of the collateral trust gold notes. In other words, there is no allegation of any want of good faith or proper conduct on the part of Steere, and therefore no showing of facts which would justify the court in allowing the note holders themselves to intervene. Laying aside the convincing findings of the court, and reading appellant's petition in the light of the record of the proceedings in question, it must be held that he fails to make a case which entitles him to the relief demanded.

[3] The further ground for dismissing Pillinger's petition is found in the facts of record, which indicate unmistakingly that for the most part, if not altogether, the actual owners of these gold notes, which Pillinger says he owns "by delivery thereof to him," had knowledge all along, or were chargeable with knowledge, of the proceedings under review, and therefore are estopped from questioning the jurisdiction of the court to appoint a receiver of the railroad company or the validity of the certificates which were authorized by successive orders of the court and made a first lien on the railroad property. Some of the facts referred to are these:

One of the note holders, Alice Lincoln Barker, was of course aware from first to last of what was done, because she came in as an intervener before any of the certificates were authorized. The attorneys representing her in that intervention were also attorneys of record for Steere in the foreclosure suit, which he was allowed to bring. His other attorney in that suit was Samuel Adams, of Chicago, whose law partner, Hawley, was one of the commissioners appointed by the court to sell the railroad in the foreclosure proceeding; and as to what occurred when the last issue of certificates was authorized, in February, 1918, the court below finds as follows:

"That upon the argument of this motion it was stated in open court by Mr. Swain, one of the counsel for said Henry Pillinger, that the said Henry Pillinger was merely a nominal holder of the $165,000 of collateral trust gold notes mentioned in his petition herein; that when the $165,000 of said notes were first issued they were purchased by the firm of Clark L. Poole & Co., of Chicago, Ill., and that upon the sale of the same said notes were indorsed by the said firm of Clark L. Poole & Co.; that because of the default in the payment thereof, and their indorsement thereon, said firm of Clark L. Poole

& Co., had been obliged to take up said notes or procure them to be taken up; and that all of said notes were really owned by said Clark L. Poole or by his wife.

"That on February 21, 1918, when the last $40,000 of receiver's certificates of indebtedness of the Watauga & Yadkin River Railroad Company were directed to be issued, the question before the court was whether said railroad should then be sold upon the application of certain judgment creditors, or whether the sale of the same should be further postponed, which postponement involved the issuance of further receiver's certificates to pay the then existing indebtedness of the receiver and to furnish funds to keep and maintain the property; that at that time, in the presence of this court, further delay in the sale of said railroad was requested by counsel from Chicago, accompanying said Clark L. Poole and assuming in his presence to speak for him; that at that time the court stated that no further receiver's certificates would be authorized by the court, except upon the consent of all parties, whereupon all of the counsel then in court in the presence of said Clark L. Poole, assented to the issuance of said additional receiver's certificates."

True, the reply brief of Pillinger asserts that this is an inaccurate and incomplete version of what counsel stated at the time, and that as a matter of fact—

"the beneficial interest in these securities is in a number of persons and corporations, scattered from Pennsylvania to Missouri, although it is true that it was at the instance of Mr. Clark L. Poole that they were collected and placed in the hands of appellant, for the purpose of realizing upon the same, if possible, and of saving some part of the investment thereby represented."

But it is nowhere denied that Poole was personally in court with his counsel when the order was made, or that his counsel in his presence requested a postponement of the sale and consented to the issuance of the certificates made necessary by that postponement. Nor is it denied that the securities were collected by Poole and placed in the hands of Pillinger, with a "declaration of trust," after the sale of the railroad property in the following December. In view of these facts it is difficult to believe that the beneficial owners of these gold notes, or their representatives, were not fully informed from time to time of the nature and effect of the prior proceedings. Indeed, it seems fairly inferable that all the parties in interest were anxious to keep the railroad a going concern, and to that end were willing to have receiver's certificates issued as needed, in the hope and belief that the railroad would ultimately sell for enough to retire the certificates and pay the obligations secured by a pledge of the deed of trust. Apparently this was the only chance the owners of the gold notes had of realizing on their security, for the railroad in question, unfinished and abandoned, with the lumber company hopelessly insolvent and out of business, would have had little, if any, salable value; and it was not until after the sale at a disappointing price, which was not increased during the time allowed to obtain a higher bid, that this attempt was made to invalidate all the certificates, on the ground that the court was without jurisdiction to appoint a receiver.

We are clearly of opinion that the attempt should fail, for the reason, if no other, that Pillinger, who now claims to be the holder of most of the notes under some belated declaration of trust, is in no better position to assail the proceedings under review than are the ben-

eficial owners themselves, and that they are estopped by their own assent and consent, or by the assent and consent of their representatives; that is to say, by the knowledge they actually had or with which they are chargeable.

The order dismissing appellant's petition will be affirmed.